IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| VIVIAN YOUNG, | ) | 8:14CV15 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| CAROLYN J. COLVIN, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

In this social security appeal, plaintiff Vivian Young ("Young") argues that the Commissioner of Social Security committed reversible error in determining that she is not entitled to disability insurance benefits. For the reasons discussed below, the Commissioner's decision is reversed and remanded.

## I. BACKGROUND

On March 16, 2011, Young filed her application for disability insurance benefits. (Tr. 118-119.) Young's claims were denied initially and on reconsideration. (Tr. 60, 63, 64-67, 71-74.) Thereafter, Young filed a written request for a hearing. (Tr. 11.) A hearing was held on November 1, 2012, and on November 13, 2012, an Administrative Law Judge ("ALJ") concluded that she was not disabled under sections 216(i) and 223(d) of the Social Security Act. (Tr. 11-20.) In her decision, the ALJ followed the five-step sequential analysis prescribed by the Social Security

Regulations to evaluate Young's claims.[1]  *See* [20 C.F.R. § 416.1520(a)](#).  The ALJ found as follows:

> 1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2012, but not thereafter.
>
> 2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 18, 2011, through her date last insured of June 30, 2012. (20 CFR 404.1571 *et seq*.)
>
> 3. Through the date last insured, the claimant had the following severe impairments: bipolar disorder, status post fusion of the cervical spine in March of 2011, and diabetes. (20 CFR 404.1520(c))
>
> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically

---

[1] The Social Security Administration uses a five-step process to determine whether a claimant is disabled.  These steps are described as follows:

> At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006).

        equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (20 CFR 416.920(d), 404.1525 and 404.1526)

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to occasionally lift and carry up to 20 pounds and 10 pounds frequently. The claimant can understand, and remember and carry out short and simple instructions under ordinary supervision, can sustain attention and concentration for tasks and carry them out in a simple job setting. The claimant can persist in tasks and follow through and complete them, can interact appropriately with co-workers and supervisors, can handle social interactions adequately on the job and could adapt to changes on the job.

6. Through the date last insured, the claimant was capable of performing past relevant work as a cashier (DOT#211.426-010 light, unskilled). This work did not require the performance of work related activities precluded by the claimant's residual functional capacity. (20 CFR 404.1565)

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 18, 2011, the alleged onset date, through June 30, 2012, the date last insured. (20 CFR 404.1520(f))

(Tr. 13-20.) After the ALJ issued his decision, Young filed a request for a review with the Appeals Council. (Tr. 1, 7.) On November 20, 2013, the Appeals Council denied Young's request for review. (Tr. 1-6.) Thus, the ALJ's decision stands as the final decision of the Commissioner of Social Security.

## II.  STANDARD OF REVIEW

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole.  *Hogan v. Apfel*, 239 F.3d 958, 960 (8th Cir. 2001).  "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.  *Id.* at 960-61; *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).  Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome.  *See Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result.  *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992).  Issues of law are reviewed de novo. *Olson v. Apfel*, 170 F.3d 820, 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n.2 (8th Cir. 1995).

## III.  DISCUSSION

**A.     Relevant Medical History and Opinions**

On January 21, 2011, Young was admitted to Immanuel Medical Center with acute agitation and thoughts of harming others.  (Tr. 327, 330.)  The attending physician Hudson HT Hsieh ("Hsieh") diagnosed Young with bipolar disorder with mania and psychosis.  (Tr. 347.)  Hsieh assigned an estimated current Global Assessment of Functioning ("GAF") score of 20 and planned for Young to undergo a medical and psychological evaluation, observation for potential harm to herself or others, a medication adjustment, and individual and group therapy.  (*Id*.)

4

On January 25, 2011, Young was discharged. (Tr. 327-28.) However, she was readmitted two days later for further evaluation after her employer notified her that she had been terminated. (Tr. 312.) By January 31, 2011, Young's condition had stabilized and she was again discharged for outpatient follow-up treatment. (*Id*.) Upon discharge, Hsieh assigned a current GAF score of 50. (Tr. 312-13).

On April 26, 2011, consultative Psychologist Jennifer Lindner, Ph.D. ("Lindner"), examined Young. (Tr. 357-60.) Lindner's examination revealed that Young was fully oriented; appeared to have average cognitive functioning, memory, and concentration; did not appear impulsive; demonstrated abstract reasoning skills; and had a neutral mood and appropriate speech and affect. (Tr. 358.) Lindner noted Young's daily activities were impaired due to frequent episodes of depression and mania, during which she became incapacitated, and appeared to have difficulty coping with stress, which exacerbated her condition. (Tr. 359.)

During the examination, Young reported to Lindner that she had friends she communicated with through Facebook. (Tr. 357.) She also reported that she last had a job as an office manager, but was fired for leaving an inappropriate voicemail. (*Id*.) Lindner noted that Young appeared to have adequate social functioning and concentration, but struggled with concentration during a manic or depressive episode. (Tr. 359.) Lindner opined that Young could understand short and simple instructions, carry out instructions under ordinary supervision, interact appropriately with coworkers and supervisors, adapt to changes in her environment, and manage her money. (*Id*.)

Overall, Lindner diagnosed Young with bipolar disorder I, with a most recent severe manic episode, and assigned Young a GAF score of 50. (*Id*.) Lindner reported that Young's prognosis was guarded due to significant issues with emotional lability that interfered with her functioning for extended periods of time and made it difficult for her to maintain a job. (*Id*.) Lindner recommended vocational rehabilitation to

5

help Young work on maintaining employment, continued medication management, and ongoing therapy. (*Id.*)

On June 9, 2011, state agency psychologist Jennifer Bruning Brown, Ph.D. ("Brown"), reviewed Young's records and evaluated her mental impairments and mental residual functional capacity. (Tr. 387-404.) Brown concluded that Young's mental impairment caused no more than moderate limitations. (Tr. 401-402.) She reiterated Lindner's opinion that Young would be able to understand, remember, and carry out short and simple instructions; sustain attention and concentration for tasks and carry them out in a simple job setting; persist on tasks and follow through and complete them; interact appropriately with coworkers and bosses; adapt to changes on the job; and appropriately deal with job schedules, time commitments, and necessary adaptations while on a job. (Tr. 403.)

In April 2012, Young started seeing Advanced Practice Registered Nurse ("APRN") Rachel Kozol ("Kozol") for medication management. (Tr. 451-52, 453.) On June 4, 2012, Young visited Kozl reporting that she had been depressed and more tearful, was having trouble sleeping, felt overwhelmed and more hopeless, and had low energy. (Tr. 451.) Kozol noted that Young's mood was depressed and her affect downcast, but that she was appropriately dressed, had coherent thought processes, had no psychosis or thoughts of hurting herself or others, was fully oriented, and had fair insight and judgment. (*Id.*) Kozol adjusted Young's medications and assigned her a current GAF score of 48. (Tr. 451-52.) Young continued to see Kozol until her insurance status expired on June 30, 2012. (Tr. 20, 461-74.)

On October 3, 2012, Kozol completed a mental impairment questionnaire. (Tr. 454-460). In the questionnaire, Kozol indicated that Young had a current GAF score of 48 and highest past-year GAF score of 52. (Tr. 454.) She reported that Young continued to report experiencing low energy, poor motivation, insomnia, and depressed mood. (Tr. 455.) Kozol reported that Young denied any side effects from

6

her medications. (Tr. 456.) Kozol opined that Young had no useful ability to remember work-like procedures, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, understand and remember detailed instructions, carry out detailed instructions, and deal with stress of semiskilled and skilled work. (Tr. 457-59.) Kozol indicated that Young had marked difficulties in maintaining social functioning, concentration, persistence or pace, and had four or more episodes of decompensation. (Tr. 459-60.)

**B.     Hearing Testimony**

On November 1, 2012, Young testified at an administrative hearing before the ALJ. (Tr. 26-50.) Young stated that she had lived with her parents since 2005 and had a 19-year-old daughter who lived in a college dorm. (Tr. 30-31.) Young testified that she has a college degree in general studies and a computer language certification. (Tr. 31.) Young stated her last place of employment was as a data services manager at West Corporation. (*Id*.) Young was terminated on January 26, 2011, after she missed work when she was in the hospital. (Tr. 31-32.)

Young testified that her bipolar disorder prevented her from maintaining a job because when she was manic, she was unable to get along with coworkers, had racing thoughts, trouble concentrating, and difficulty staying on task. (Tr. 36.) When depressed, Young had trouble getting out of bed, was tardy or absent from work, and often had to leave her workstation so that other people would not see her crying. (Tr. 36.) Young testified that she typically was depressed two to three times a year for three to six months at a time, and that she had been depressed since April 2011. (Tr. 43.)

Young further testified that she spent most of her time in her room, but saw her daughter at least three times a week and her sisters when they came over. (Tr. 36, 39.)

With regard to activities, Young drove her parents to their medical appointments, went to the grocery store and gas station, made lunch and dinner for herself and her parents, and performed household chores including cleaning her room, helping her mother clean the house, washing dishes, vacuuming, cleaning the bathroom, and washing clothes. (Tr. 36-39.) Young stated that she used the computer for email and to read about her illness, but not for Facebook or social networking. (Tr. 38.) With regard to medications, Young testified that they made her "very drowsy," caused her to eat too much, crave sugar, and sometimes caused dizziness and dry mouth. (Tr. 47.)

Vocational expert Deborah Determan ("Determan") testified that Young's past relevant work included skilled sedentary work as a software-testing specialist, unskilled light work as a cashier, unskilled medium work as a janitor, and semi-skilled light work as an office clerk. (Tr. 52.) The ALJ asked Determan whether a hypothetical person of Young's age and education, who had Young's work experience and residual functional capacity, could perform Young's past relevant work. (Tr. 19, 52-53.) Determan testified that such a person could perform Young's past relevant work as a cashier. (Tr. 53.) She further testified that such a person also could perform unskilled sedentary and light work as an addresser, telephone quote clerk, food and beverage order clerk, counter attendant, information clerk, and routing clerk. (Tr. 53-54.)

## C.  Young's Arguments on Appeal

In her appeal brief, Young argues that the ALJ's opinion is not supported by substantial evidence because the ALJ (1) failed to properly weigh Lindner's opinion, (2) failed to properly weigh Kozol's opinion, (3) improperly assessed her credibility, and (4) presented a hypothetical question to the vocational expert that did not reflect her limitations. (Filing 16 at CM/ECF pp. 15-34; Filing 18 at CM/ECF pp. 5-14.) The Commissioner contends that the ALJ's decision is supported by substantial

evidence. (Filing 17 at CM/ECF pp. 10-21.) I will explore Young's arguments in turn.

### 1. *Weight Provided to Lindner's Opinion*

In making a residual functional capacity determination, an ALJ must evaluate every medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ should give a treating source's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). "Unless a treating source's opinion is given controlling weight, the administrative law judge *must explain* . . . the weight given to the opinions of a State agency medical or psychological consultant." 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii) (emphasis added); SSR 96–6p, 1996 WL 374180 (July 2, 1996) (providing ALJs may not ignore opinions of state agency and medical psychological consultants and must explain the weight given to these opinions in their decisions.); *see also Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008) (discussing, where an ALJ implicitly relied on a nonexamining state medical consultant's residual functional capacity assessment, that providing an explanation of the weight given to that assessment would have both complied with the regulations and assisted the court in reviewing the decision).

Young argues that the ALJ erred because she failed to assign weight to Lindner's opinion. (Filing 16 at CM/ECF pp. 25-27.) The ALJ analyzed Lindner's opinion as follows:

> On April 26, 2011, the claimant underwent [a] psychological consultative examination performed by Dr. Lindner. It was noted that the claimant has a Bachelor's degree in General Studies from UNO and is certified in computer programming. She was not working and it was

9

> noted "she was fired while on medical leave for leaving an inappropriate voicemail for her manager." She was seeking employment but "has not had any success." In addition, it was noted "she stated that she often has problems with her mental health every 6 months and frequently loses her job when she is experiencing an episode." The claimant reported that she was diagnosed with a bipolar disorder in 2001 and had a history of suicide attempts with the last one being in 2004. In January of 2011 she was hospitalized "for 5 days for homicidal ideation, released for 2 days, and then re-hospitalized for 5 days." She was being seen by Dr. Ashley Walter at Immanuel Psychiatric Associates for medication management and was taking Ativan and Tomazipan. It was noted "she stated that her medication addresses her depressive episodes, but she still has manic episodes." The claimant indicated that her activities included helping her mother take care of her father, looking for jobs on the computer and at the job service center, visiting with her mother and daughter and making dinner. The doctor concluded that the claimant would be capable of understanding and carrying out short and simple instructions under ordinary supervision, would be capable of appropriately interacting with co-workers and supervisors, would be capable of adapting to changes in her environment and capable of managing her own money. The diagnosis was bipolar disorder I and her Global Assessment Functioning was 50.

(Tr. 16.)

Despite this analysis, the ALJ did not explain the weight given to Lindner's opinion, nor did she discuss the opinion of nonexamining state agency psychologist Brown, an opinion that reiterated portions of Lindner's opinion. (Tr. 14-20, 401-03.) *Most importantly, the ALJ did not discuss, nor discount, Lindner's statement that Young's prognosis was guarded due to significant issues with emotional lability[2] that*

---

[2]"In psychology or psychiatry, denoting free and uncontrolled mood or behavioral expression of the emotions." medilexicon, Definition: 'Labile' (last accessed April 20, 2012).

*interfered with her functioning for extended periods of time and made it difficult for her to maintain a job.* (Tr. 16, 359.)

Indeed, the only explanation of weight given to a medical opinion in the record was that provided for Kozol's opinion. (Tr. 17.) In this regard, the ALJ stated Kozol's "opinion expressed on the Mental Impairment Questionnaire is not given significant weight as she is an unacceptable medical source," and for the most part, it appears "exaggerated when compared to [her] own progress notes." (*Id.*)

The Commissioner acknowledges that the ALJ did not explicitly give Lindner's opinion weight and argues that such a failure is lessened because the opinion was consistent with the ALJ's findings. (Filing 17 at CM/ECF pp. 15-16.) Such an argument may have merit where the deficiency in the ALJ's opinion would not affect the result of the opinion on remand. *See Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004) ("We will not set aside an administrative finding based on an 'arguable deficiency in opinion-writing technique' when it is unlikely it affected the outcome."). Here, however, the ALJ failed to thoroughly summarize the medical opinions of record, discuss the weight given to the medical opinions, or discuss the reasons why some of the limitations discussed in Lindner's opinion were not included in the ALJ's residual functional capacity determination. Stated another way, it is unclear whether the result would be affected on remand because it is unclear how the ALJ weighed the medical evidence. Further, the court cannot resolve the conflicts between Lindner's opinion and the ALJ's residual functional capacity assessment without conducting a post-hoc rationalization.[3] *See generally, Burlington Truck Lines, Inc. v. United States,*

---

[3] I note that the vocational expert testified that Young would be unable to sustain work if she was active in treatments and hospitalizations that would take her away from work. (Tr. 58.) This testimony appears to correlate to Lindner's statement regarding Young's significant issues with emotional lability that interfere with her functioning for extended periods of time and make it difficult for her to maintain a job. (Tr. 359.)

11

371 U.S. 156, 168–69 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action[.]").

In light of this, I will remand this matter to the ALJ for further explanation of the weight provided to the opinions of Lindner and Brown in accordance with 20 C.F.R. §§ 404.1527(c), 416.927(c) and SSR 96–6p. *See, e.g., Porter v. Astrue*, No. 4:10CVC537, 2011 WL 4007901, at *12 (E.D. Mo. Sept. 8, 2011) (concluding ALJ erred by not explaining the weight given to the opinion of a state agency psychologist where the ALJ did not give controlling weight to the opinion of a treating source); *Eckermann v. Astrue*, 817 F. Supp. 2d 1210, 1224-25 (D. Idaho 2011) (remanding for proper evaluation of the medical record where the ALJ failed to discuss or explain the weight given to any of the medical opinions in the record, even though it was clear that the ALJ accepted the opinion of a consulting medical expert). When evaluating Lindner's opinion, the ALJ should be mindful to resolve any inconsistencies or conflicts that exist between Lindner's statements and the ALJ's ultimate residual functional capacity determination. Indeed, it is the province of the ALJ, not this Court, to resolve inconsistencies and conflicts that exist in the medical records. *See Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007).

*2. Remaining Arguments*

Because Young's additional claims of error may be addressed through the case's treatment on remand, I decline to address them here.

Accordingly,

IT IS ORDERED that:

1. The Commissioner's decision is reversed and remanded for further proceedings consistent with this opinion.

2. Judgment shall be entered by separate document providing that the decision of the Commissioner is reversed and remanded.

DATED this 20th day of April, 2015.

BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.